Austin C. Smith, NY Bar No. 5377254
Kathryn J. Johnson, LA Bar No. 36513
SMITH LAW GROUP LLP
99 Wall Street, No. 426
New York, New York 10005
(917) 267-2068
austin@acsmithlawgroup.com
kaki@acsmithlawgroup.com

Christopher Bush, CA Bar No. 243471
LAW OFFICE OF CHRIS BUSH
2727 Camino del Rio S., Ste. 135
San Diego, California 92108
(619) 678-1134
chris@chrisbushlaw.com

*Counsel for Plaintiff-Appellant*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>Cesar Medina, Krystal Anne Medina,<br><br>*Debtors*.<br>──────────<br>Krystal Anne Medina,<br><br>*Plaintiff-Appellant,*<br><br>v.<br><br>National Collegiate Student Loan Trust 2006-3,<br><br>*Defendant-Appellee.* | Case No. 20-CV-1912-BEN-MDD<br><br>Bankruptcy No. 17-BK-05276-LT<br>Adversary No. 19-AP-90065-LT<br><br>Appeal from the Judgment of the United States Bankruptcy Court for the Southern District of California, The Honorable Laura S. Taylor, Judge<br>Adversary No. 19-AP-90065-LT<br><br>**OPENING BRIEF OF PLAINTIFF-APPELLANT** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ......................................................... iii

INTRODUCTION ..................................................................... 1

STATEMENT OF JURISDICTION .............................................. 3

ISSUES PRESENTED FOR REVIEW ......................................... 4

STANDARD OF REVIEW ......................................................... 4

STATEMENT OF CASE ............................................................ 4

I.    Section 523(a)(8) of the Bankruptcy Code and the Higher Education Act.. 4

II.   Factual Background ......................................................... 8

III.  Procedural History .......................................................... 12

SUMMARY OF ARGUMENT .................................................... 12

ARGUMENT ........................................................................... 13

I.    Section 523(a)(8)(A)(i) does not except from discharge loans made under programs guaranteed by TERI. ...................................... 13

    A.    Exceptions to discharge must be narrowly construed in favor of the debtor. ................................................................. 13

    B.    The exception for loans made under programs "funded" by "nonprofit institutions" does not except loans made under programs guaranteed by TERI. ......................................................... 14

II.   Section 523(a)(8)(A)(i) does not except from discharge Medina's Loan. ...................................................................... 27

    A.    The Bankruptcy Court must view the evidence in the light most favorable to Plaintiff, as nonmovant. ............................ 27

    B.    There is a genuine issue of material fact as to whether TERI actually guaranteed Medina's Loan or Loan Program. ................... 28

- i -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT          20-CV-1912-BEN-MDD

C.  There is insufficient evidence that TERI is or was a *bona fide* nonprofit. ....................................................................... 38

CONCLUSION........................................................................ 41

CERTIFICATE OF COMPLIANCE...................................... 42

CERTIFICATE OF SERVICE ............................................. 43

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Bates v. United States*,
  522 U.S. 23 (1997) ...................................................................... 27

*Becirevic v. Navient Sols., LLC*,
  2019 WL 4046770 (E.D. Tex. May 30, 2019) ...................................................... 10

*Beth Rochel Seminary v. Bennett*,
  825 F.2d 478 (D.C. Cir. 1987)...................................................... 13

*C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*,
  213 F.3d 474 (9th Cir. 2000) ...................................................... 33

*Equal Employment Opportunity Commission v. Southwestern Baptist Theological*
  *Seminary*,
  651 F.2d 277 (5th Cir. 1981) ...................................................... 13

*Est of Hawaii v. Comm'r of Internal Revenue*,
  71 T.C. 1067 (1979) ...................................................... 45

*First Marblehead Corp. v. House*,
  541 F.3d 36 (1st Cir. 2008) ...................................................... 45

*Giannullo v. City of New York*,
  322 F.3d 139 (2d Cir. 2003) ...................................................... 33

*Grogan v. Garner*,
  498 U.S. 279 (1991) ...................................................... 44

*Grojean v. Commissioner*,
  248 F.3d 572 (7th Cir. 2001) ...................................................... 22

*Guillermety v. Sec'y of Educ. of U.S.*,
  241 F. Supp. 2d 727 (E.D. Mich. 2002) ...................................................... 35

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT      20-CV-1912-BEN-MDD

*Hazelton v. UW-Stout*,
    2019 WL 413567 (W.D. Wis. Feb. 1, 2019) ........................................ 19

*In re Abdelgadir*,
    455 B.R. 896 (B.A.P. 9th Cir. 2011) .............................................. 35, 36

*In re Adamo*,
    619 F.2d 216 (2d Cir. 1980) .............................................................. 11

*In re Christoff*,
    510 B.R. 876 (Bankr. N.D. Cal. 2014) .............................................. 23

*In re Christoff*,
    527 B.R. 624 (B.A.P. 9th Cir. 2015) ............................................... 9, 18

*In re Conti*,
    2020 WL 7331502 (6th Cir. Dec. 14, 2020) ..................................... 32

*In re Crocker*,
    941 F.3d 206 (5th Cir. 2019) ...................................................... 18, 23

*In re Dickerson*,
    510 B.R. 289 (Bankr. D. Idaho 2014) .............................................. 32

*In re Essangui*,
    573 B.R. 614 (Bankr. D. Md. 2017) ................................................. 23

*In re Golden*,
    596 B.R. 239 (Bankr. E.D.N.Y. 2019) ............................................... 8

*In re Goldstein*,
    2012 WL 7009707 (Bankr. N.D. Ga. Nov. 26, 2012) ................... 22, 32

*In re Greer-Allen*,
    602 B.R. 831 (Bankr. D. Mass. 2019) .............................................. 38

*In re Hammarstrom*,
    95 B.R. 160 (Bankr. N.D. Cal. 1989) ...................................... 7, 21, 23

- iv -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

*In re Johnson*,

218 B.R. 449 (B.A.P. 8th Cir. 1998) ................................................................ 29

*In re Kendall*,

380 B.R. 37 (Bankr. N.D. Okla. 2007) ............................................................. 41

*In re Marcano*,

288 B.R. 324 (Bankr. S.D.N.Y. 2003) .............................................................. 44

*In re Mata*,

2020 WL 5543716 (Bankr. C.D. Cal. July 31, 2020) ........................................ 25

*In re McDaniel*,

973 F.3d 1083 (10th Cir. 2020) ..................................................... 19, 23, 32

*In re Merchant*,

958 F.2d 738 (6th Cir. 1992) ...................................................................... 23, 24

*In re Murphy*,

282 F.3d 868 (5th Cir. 2002) ............................................................................ 7

*In re Nypaver*,

581 B.R. 431 (Bankr. W.D. Pa. 2018) .............................................................. 23

*In re O'Brien*,

318 B.R. 258 (S.D.N.Y. 2004) ......................................................................... 45

*In re Pilcher*,

149 B.R. 595 (B.A.P. 9th Cir. 1993) ............................................................. 7, 24

*In re Rent-Rite SuperKegs W. Ltd.*,

2020 WL 6689166 (D. Colo. Aug. 12, 2020) .................................................... 26

*In re Rosen*,

179 B.R. 935 (Bankr. D. Or. 1995) .................................................................. 44

*In re Roth*,

490 B.R. 908 (B.A.P. 9th Cir. 2013) ........................................................... 19, 32

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

*In re Roy*,

2010 WL 1523996 (Bankr. D.N.J. Apr. 15, 2010)............................................. 22

*In re Skipworth*,

2010 WL 1417964 (Bankr. N.D. Ala. Apr. 1, 2010)........................................... 22

*In re Southard*,

2 B.R. 124 (Bankr. W.D. Va. 1979) .................................................................. 11

*In re Stewart*,

592 B.R. 414 (B.A.P. 1st Cir. 2018).................................................................. 21

*In re The First Marblehead Corp. Sec. Litig.*,

639 F. Supp. 2d 145 (D. Mass. 2009)............................................................... 46

*In re Tremblay*,

2012 WL 2915367 (Bankr. S.D. Cal. July 16, 2012) ........................................ 35

*In re Yee*,

7 B.R. 747 (Bankr. E.D.N.Y. 1980) .................................................................. 12

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,

31 F.C.C. Rcd. 9074 (2016) ............................................................................. 28

*Inter-Am. Univ. of Puerto Rico, Inc. v. Concepcion*,

716 F.2d 933 (1st Cir. 1983) ........................................................................... 10

*Lee v. Bd. of Higher Ed. in City of New York*,

1 B.R. 781 (S.D.N.Y. 1979) ............................................................................. 30

*Lucas v. Bell Trans*,

773 F. Supp. 2d 930 (D. Nev. 2011) ................................................................ 33

*Matter of Williamson*,

25 B.R. 49 (Bankr. M.D. Ga. 1982) ................................................................. 10

*Matter of Williamson*,

665 F.2d 683 (5th Cir. 1982) ........................................................................... 12

- vi -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT                20-CV-1912-BEN-MDD

*McClure v. United States*,

  95 F.2d 744 (9th Cir. 1938) ................................................................... 32

*Muniz v. Hoffman*,

  422 U.S. 454 (1975) ............................................................................... 32

*Nat'l Collegiate Student Loan Tr. 2003-1 v. Thomas*,

  48,627 (La. App. 2 Cir. 11/20/13); 129 So. 3d 1231 ............................. 43

*Nat'l Collegiate Student Loan Tr. 2007-4 v. Watson*,

  61 N.Y.S.3d 191 (N.Y. Civ. Ct. 2016) ................................................... 42

*NTL Collegiate Stndt Loan Tr. 2005-1 v. Owusu*,

  12th Dist. Butler No. CA2015-07-137, 2016-Ohio-259, 2016 WL 363550 ........ 43

*Oliver Sch., Inc. v. Foley*,

  881 F. Supp. 847 (W.D.N.Y. 1994) ........................................................ 10

*P.L.L. Scholarship Fund v. Comm'r of Internal Revenue*,

  82 T.C. 196 (1984) ................................................................................. 45

*St. George's Univ. Sch. of Med. v. Bell*,

  514 F. Supp. 205 (D.D.C. 1981) ............................................................. 12

*Tenn. Student Assistance Corp. v. Hood*,

  541 U.S. 440 (2004) ............................................................................... 18

*TI Fed. Credit Union v. DelBonis*,

  72 F.3d 921 (1st Cir. 1995) ............................................................. 44, 45

*United States v. Diwre*,

  872 F.2d 431 (9th Cir. 1989) ................................................................. 28

*United States v. Marxen*,

  307 U.S. 200 (1939) ............................................................................... 35

*Zimmerman v. Cambridge Credit Counseling Corp.*,

  409 F.3d 473 (1st Cir. 2005) ........................................................... 44, 45

- vii -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT          20-CV-1912-BEN-MDD

*Zimmerman v. Cambridge Credit Counseling Corp.*,

   529 F. Supp. 2d 254 (D. Mass. 2008)....................................................... 45

**Statutes**

2 U.S.C. § 661a .......................................................................................... 28

11 U.S.C. § 101(12A)(B) ........................................................................... 44

11 U.S.C. § 523(a)(8) ........................................................................*passim*

11 U.S.C. § 525(c)(1) (1994) .................................................................... 28

11 U.S.C. § 1123(b)(5) .............................................................................. 36

14 U.S.C. § 2772(a)(1)(A) ........................................................................ 30

20 U.S.C. § 1019(3) ................................................................................... 19

20 U.S.C. § 1071.................................................................................. 10, 30

20 U.S.C. § 1087aa ................................................................................... 30

20 U.S.C. § 1087cc ................................................................................... 30

20 U.S.C. § 1087dd................................................................................... 30

20 U.S.C. § 1087gg ................................................................................... 10

28 U.S.C. § 157 .......................................................................................... 8

28 U.S.C. § 158 .......................................................................................... 8

28 U.S.C. § 1332 ........................................................................................ 8

28 U.S.C. § 1334 ........................................................................................ 8

Pub. L. No. 96-56, § 523(a)(8), 93 Stat. 387 ........................................... 12

Pub. L. No. 95-598, § 523(a)(8), 92 Stat. 2549 ................................. 11, 27

Pub. L. No. 98-353, § 454(a) 98 Stat. 33311 ........................................... 13

**Rules**

Fed. R. App. P. 32...................................................................................... 48

Fed. R. Bankr. P. 8002............................................................................... 8

**Regulations**

34 C.F.R. § 668.1....................................................................................... 32

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

34 C.F.R. § 668.14 ........................................................ 32

*National Banks and Federal Savings Associations as Lenders,*

  85 FR 68742-01 ...................................................... 26

**<u>Other Authorities</u>**

*Bankruptcy Improvements Act: Hearing on S. 333 and S. 445 Before the S. Comm.*

  *On the Judiciary*, 1983 WL 506604 ..................................... 13, 14, 31

H.R. Rep. 95-595 ......................................................... 24

Pub. L. No. 103-394, § 313, 108 Stat. 4106 ............................... 28

S. Rep. 96-230 ....................................................... 11, 12, 29

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

**INTRODUCTION**

This appeal seeks to reverse a decision that would further amplify the current student loan crisis in the United States. Plaintiff-Appellant, Krystal Anne Medina ("Plaintiff" or "Medina"), appeals the Opinion and Findings of Fact and Conclusions of Law Granting Defendant's Motion for Summary Judgment ("Decision"), issued by the Honorable Laura S. Taylor of the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court"), which held that Medina's debt to Defendant-Appellee, National Collegiate Student Loan Trust 2006-3 ("Defendant" or the "Trust")—one of seventeen Delaware statutory trusts that own more than 800,000 private student loans—was excepted from discharge under 11 U.S.C. § 523(a)(8) ("Section 523(a)(8)"). Dkt. No. 1-2, *see also* Bk. Dkt. No. 83.[1]

Specifically, the Bankruptcy Court agreed with the argument espoused by the Trust that Medina's debt is non-dischargeable as a loan made under a program guaranteed by a now defunct "nonprofit" corporation, and therefore subject to Section 523(a)(8)(A)(i) as an "educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution." Rather than interpreting the statute narrowly and in favor of discharge, the Bankruptcy Court concluded that by using the term "funded" in Section 523(a)(8)(A)(i), Congress intended to protect from discharge any educational loan to which a self-proclaimed "nonprofit" corporation—in this case, The Educational Resources Institute, Inc. ("TERI")— made "any meaningful contribution." Notably, the Bankruptcy Court concluded that "TERI's guaranty of all loans under the program is sufficient in itself to meet the

---

[1] References to "Bk. Dkt. No." refer to the docket entries in the Bankruptcy Court adversary proceeding below, *Medina v. National Collegiate Student Loan Trust 2006-3*, Adv. No. 19-AP-90065-LT (Bankr. S.D. Cal. filed June 28, 2019). All such docket entries were designated as part of the record on appeal by Plaintiff-Appellant.

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

1  funding requirement under § 523(a)(8)(A)(i) and evidence that TERI actually paid

2  on the guaranty is not necessary." Dkt. No. 1-2 at 10, *see also* Bk. Dkt. No. 83 at 8.[2]

3      Section 523(a)(8)(A)(i) contains two discharge exceptions. The first,

4  referencing guaranteed loans, applies to debts for loans guaranteed by a

5  governmental unit. The second, referencing loans "made under any program funded

6  in whole or in part by a … nonprofit institution" does not use the word "guaranteed,"

7  and was intended to apply to debts for loans made under the National Direct Student

8  Loan Program, protecting from discharge debts for loans made directly to students

9  by nonprofit colleges and universities, funded either partially or wholly by the

10  government. The cases interpreting Section 523(a)(8)(A)(i) broadly are,

11  respectfully, in error. Those decisions disregard basic canons of statutory

12  interpretation, holding that "program" means a marketing platform, "funded" means

13  "played any meaningful part," and "nonprofit institution" means any 501(c)

14  corporation.[3] But Congress was not so careless in its selection of words when

15  drafting Section 523(a)(8)(A)(i). The words "program," "funded," and "nonprofit

16  institution" were purposely selected by Congress as the building blocks for

17  constructing the lending programs under Title IV of the Higher Education Act

18  ("HEA").[4] Once read in conformity with the HEA, it is clear that a debt like

19  Medina's is not excepted from discharge under Section 523(a)(8)(A)(i).

20      Even if the Bankruptcy Court's statutory construction were sound, the

21  evidence below shows there is a genuine issue of material fact as to whether TERI

22  actually guaranteed the loan program under which Medina's loan—now forming the

23

24  [2] As will be discussed, the conclusory statement that TERI guaranteed "*all* loans

25  under the program" is directly refuted by the evidence.

26  [3] *See, e.g.*, *In re Pilcher*, 149 B.R. 595, 600 (B.A.P. 9th Cir. 1993); *In re Hammarstrom*, 95 B.R. 160, 165 (Bankr. N.D. Cal. 1989).

27  [4] *In re Murphy*, 282 F.3d 868, 872 (5th Cir. 2002) (stating Section 523(a)(8) should

28  be harmonized with the HEA).

- 2 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

basis of her debt—was originated. As to whether TERI guaranteed the loan program, the Bankruptcy Court failed to recognize that the TERI guarantees were voided in TERI's bankruptcy prior to Medina filing bankruptcy and defaulting on the debt. Despite relying on Medina's bankruptcy petition date to conclude that TERI had performed on at least one loan in the same "program" as Medina's loan,[5] the Bankruptcy Court applied the loan's origination date when concluding that Medina's loan program was guaranteed by TERI. Also, the evidence does not conclusively indicate that TERI actually guaranteed all (or any) loans in the loan program. Further, there is insufficient evidence of the Trust's ownership of Medina's debt.

Similarly, the Bankruptcy Court failed to weigh the evidence in the light most favorable to the nonmovant (Medina) when determining whether TERI was a legitimate nonprofit. The evidence establishes that TERI was operated for commercial purposes,[6] and financial records suggest TERI was a commercial mechanism for the profitability of The First Marblehead Corporation ("FMC").

For these reasons and those below, this Court should reverse the Decision of the Bankruptcy Court to preserve the fundamental purposes of the Bankruptcy Code.

## **STATEMENT OF JURISDICTION**

The Bankruptcy Court has jurisdiction over the adversary proceeding pursuant to 28 U.S.C. §§ 157(a) & (b)(2)(I), 1332, and 1334(b) because it arises under and is related to a case under Title 11 and seeks a dischargeability determination. The Bankruptcy Court entered its Decision on September 10, 2020. Bk. Dkt. No. 83. Plaintiff timely filed her Notice of Appeal on September 24, 2020 as prescribed by Fed. R. Bankr. P. 8002. Dkt. No. 1. The appeal is from a final judgment, such that

---

[5] The alleged performance was pursuant to a loan program other than Medina's loan program (as defined by the Bankruptcy Court).

[6] *In re Golden*, 596 B.R. 239, 266-67 (Bankr. E.D.N.Y. 2019) (categorizing as a question of fact whether TERI was "a *bona fide* nonprofit institution" or a division of FMC).

- 3 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

the United States District Court for the Southern District of California has jurisdiction over the matter pursuant to 28 U.S.C. § 158(a)(1) & (c)(1).

## ISSUES PRESENTED FOR REVIEW

I.  Whether the Bankruptcy Court properly construed the statutory exception to discharge under Section 523(a)(8) narrowly as required under Ninth Circuit law and whether it properly construed the statutory terms "program," "funded," and "nonprofit institution" under 11 U.S.C. § 523(a)(8).

II.  Whether the Bankruptcy Court erred by examining the debt at issue as of the time of origination, as opposed to Medina's bankruptcy petition date, and whether it erred in concluding that TERI's bankruptcy had no effect on the dischargeability of Medina's debt.

III.  Whether the Bankruptcy Court erred in allowing the Trust to seek summary judgment on three occasions despite objections by Plaintiff (both in court and through Rule 56 affidavit) that the matter was susceptible to at least two reasonable interpretations.

## STANDARD OF REVIEW

I.  The bankruptcy court's interpretation of statutory law and application of the legal standard in determining whether a student loan debt is dischargeable is reviewed de novo. *In re Christoff*, 527 B.R. 624, 628 (B.A.P. 9th Cir. 2015) (citing cases).

II.  The bankruptcy court's grant of summary judgment is reviewed de novo. *Id.* (citing cases).

## STATEMENT OF CASE

**I.  Section 523(a)(8) of the Bankruptcy Code and the Higher Education Act**

Not all student loan debt is protected from discharge in bankruptcy; some is dischargeable. This case concerns that type of debt. Section 523(a)(8) of the Bankruptcy Code excepts only certain educational debts from discharge and reads:

- 4 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

(a) A discharge … does not discharge an individual debtor from any debt — …

    (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for —

        (A)   (i)   an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

                (ii)   an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

        (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

11 U.S.C. § 523(a)(8). This appeal concerns Section 523(a)(8)(A)(i).

A review of the HEA sheds light on the current version of Section 523(a)(8)(A)(i), as Congress used the same language in codifying each. The federal government began lending money to students in the 1960s and 1970s under two major lending programs authorized by the HEA,[7] each structured differently: the Guaranteed Student Loan ("GSL") Program,[8] and the National Direct Student Loan ("NDSL") Program (collectively, the "Title IV Programs").[9] GSLs were originated by private banks but insured and guaranteed by the federal government.[10] NDSLs

---

[7] Federal financing of education technically began with the GI Bill after World War II. *See* Matthew Fuller, *A History of Financial Aid to Students*, 44 Journal of Student Financial Aid 4 (2014).

[8] The GSL Program ultimately became the Federal Family Education Loan ("FFEL") Program, which ended in 2010. Loans were thereafter originated directly from the Department of Education.

[9] *Matter of Williamson*, 25 B.R. 49, 52 (Bankr. M.D. Ga. 1982) (discussing NDSL Program). The NDSL ultimately became the Perkins Loan. *See* 20 U.S.C. § 1087gg.

[10] *See* 20 U.S.C. § 1071(a)(1)(D). The GSL Program was an umbrella term for four different programs whose loans were either guaranteed by the government or reinsured. *Oliver Sch., Inc. v. Foley*, 881 F. Supp. 847, 850 (W.D.N.Y. 1994), *aff'd*, 52 F.3d 310 (2d Cir. 1995); *Becirevic v. Navient Sols., LLC*, No. 18-CV-363, 2019

---

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

were made by schools themselves, drawing upon a revolving fund of money that was in part supplied by the school and in part (and primarily) supplied by the federal government. *See Inter-Am. Univ. of Puerto Rico, Inc. v. Concepcion*, 716 F.2d 933, 934 (1st Cir. 1983). In order to ensure this money was available for future generations, Congress enacted Section 523(a)(8) in 1978 to protect the two entities involved in student lending—the government and the schools. The original version of the statute as added by the Bankruptcy Reform Act of 1978 read as follows:

> (a) a discharge . . . does not discharge an individual debtor from any debt—
>  (8) to a governmental unit, or a nonprofit institution of higher education, for an educational loan.

Act of Nov. 6, 1978, Pub. L. No. 95-598, § 523(a)(8), 92 Stat. 2549 (codified at 11 U.S.C. § 523(a)(8) (1979) (prior to 1979 amendment)) ("1978 version").[11] As written, Section 523(a)(8) was intended to capture both Title IV Programs: GSLs were owed "to a governmental unit" and NDSLs were owed to a "nonprofit institution of higher education."

The 1978 version of Section 523(a)(8) was insufficient protection for the federally subsidized loans, however. While Congress agreed that Section 523(a)(8) would cover all GSLs and NDSLs, the 1978 version as written would only except from discharge GSLs and NDSLs owed directly to governmental units or nonprofit institutions of higher education. Because the federal government did not originate GSLs, but instead guaranteed debt originated by private lenders such as commercial banks, borrowers could discharge GSLs by declaring bankruptcy before defaulting, which would prevent the assignment of the GSL to the federal government. Thus,

---

WL 4046770, at *1 (E.D. Tex. May 30, 2019), *report and recommendation adopted,* 2019 WL 4253940 (E.D. Tex. Sept. 9, 2019).

[11] *See also In re Southard*, 2 B.R. 124, 126 (Bankr. W.D. Va. 1979).

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

the debt was not owed to a "governmental unit."[12] Similarly, because NDSLs were not made or guaranteed by the government, but made using funds provided by the government by four types of "institutions" (nonprofit and for-profit colleges and secondary and post-secondary trade schools),[13] borrowers who attended for-profit colleges, vocational institutions, or trade schools could discharge their NDSLs prior to default because their debts were not owed to a "governmental unit" or "nonprofit institution of higher education."

Based on the gaps in the 1978 version,[14] Congress rewrote Section 523(a)(8) in 1979 to focus on the character of the loans:

> (a) a discharge … does not discharge an individual debtor from any debt—
> (8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a nonprofit institution of higher education.

Pub. L. No. 96-56, § 523(a)(8), 93 Stat. 387 (codified as amended at 11 U.S.C. § 523(a)(8) (1979)) ("1979 version"); *see also Matter of Williamson*, 665 F.2d 683, 684 (5th Cir. 1982). The 1979 version perfectly tracked the mechanics of the Title IV Programs—the first clause protected GSLs and the second clause protected NDSLs and the language was directly taken by Congress from Title IV.[15]

---

[12] For a comprehensive history of the amendments, *see In re Adamo*, 619 F.2d 216, 220 (2d Cir. 1980), and the Congressional record, S. Rep. 96-230 (1979).

[13] *St. George's Univ. Sch. of Med. v. Bell*, 514 F. Supp. 205, 206 (D.D.C. 1981) ("The definition of a 'institution for higher education' requires … that the institution 'is accredited by a nationally recognized accrediting agency or association', … and 'is a public or other nonprofit institution[.]'").

[14] These gaps are discussed in the 1979 Congressional record advocating for amendment of Section 523(a)(8). *See* S. Rep. 96-230, at 1-2 (1979).

[15] *In re Yee*, 7 B.R. 747, 751 n.5 (Bankr. E.D.N.Y. 1980) ("Two major loan programs, the [NDSL] and the [GSL], currently make funds available for higher education. The former … enables a student to borrow directly from an institution's

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

In 1984, one minor change was made to present day Section 523(a)(8)(A)(i), but it was not intended to drastically alter the substance of the exceptions to discharge. During the early 1980s, the Circuits wrestled with the question of whether a seminary fell within the scope of "higher education."[16] In response, and to end to such litigation, Congress amended Section 523(a)(8) to clarify its scope by omitting "of higher education."[17] The statute then read:

> (a) a discharge … does not discharge an individual debtor from any debt—
> (8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a nonprofit institution.

11 U.S.C. § 523(a)(8) (1984). Congress amended other aspects of Section 523(a)(8) over the next three decades. Notwithstanding smaller alterations, and larger changes for the "undue hardship" timeline, the language in the 1984 version of Section 523(a)(8) is essentially the current version of Section 523(a)(8)(A)(i).

## II.   Factual Background

On June 12, 2006, Medina signed and submitted to JP Morgan Chase Bank N.A. ("JPMorgan") an application for $30,000 to attend the San Diego Culinary Institute ("SDCI") from September 2006 to May 2007. Bk. Dkt. No. 64-3 at 3. The

---

loan fund, which is supported by federal and institutional contributions. ... Under the GSL program, the student borrows money from a qualifying lender, and the guarantee agency, either the Federal government, a state agency or a private nonprofit organization, endorses the loan.") (citations omitted).

[16] *See Beth Rochel Seminary v. Bennett*, 825 F.2d 478, 481 (D.C. Cir. 1987); *Equal Employment Opportunity Commission v. Southwestern Baptist Theological Seminary*, 651 F.2d 277, 279 (5th Cir. 1981).

[17] *See* Act of July 10, 1984, Pub. L. No. 98-353, § 454(a) 98 Stat. 33311 (amending 11 U.S.C. § 523(a)(8)). *See also Bankruptcy Improvements Act: Hearing on S. 333 and S. 445 Before the S. Comm. On the Judiciary*, 98th Cong. 1, 328-29 (1983) (statement of Professor Frank R. Kennedy, Univ. of Mich. Sch. of Law, Ann Arbor, Mich.), 1983 WL 506604, at 172-73.

- 8 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

application took the form of a Non-Negotiable Credit Agreement for an Education One© Education One Continuing Education Loan (the "Note"). *Id.* There exists and the Note references a corresponding Credit Agreement, but it was not submitted to JPMorgan in conjunction with the signed Note, nor is there evidence that Medina received a copy of it. *See id.* at 3-7. The Credit Agreement states that it may be the case that the "loan was made pursuant to a program funded in whole or in part by The Education Resources Institute, Inc. ("TERI"), a non-profit institution[.]" *Id.* at 5. After submitting the Note, Medina received the funds via a direct-to-consumer disbursement on June 20, 2006 (the "Loan"), along with a Note Disclosure Statement ("Disclosure") providing additional details regarding Medina's Loan. Bk. Dkt. No. 64-2. The Disclosure indicated that the principal amount of the Note was $33,149.17, inclusive of an origination fee, with an interest rate of 12.060%. *Id.*[18] At origination, the total payments (if timely made) were projected at $91,929.60—over 300% more than the amount received. Bk. Dkt. No. 64-2.

Prior to Medina receiving her Loan, Bank One, N.A. ("Bank One"), JPMorgan's predecessor-in-interest, executed a Guaranty Agreement with TERI on April 18, 2002 ("Guaranty"), with an effective date of May 13, 2002 (though email correspondence indicates that the effective date was actually May 17, 2002), for TERI to guarantee loans originated under certain "EDUCATION ONE" programs, including under the "EDUCATION ONE Continuing Education Loan Program" (the "Program"). Bk. Dkt. No. 64-6; *see also* Bk. Dkt. No. 37-2 at 21. The Guaranty indicates that TERI's guarantee of loans under the Program is conditional—thus, it is possible based on the text of the Guaranty that none of the loans in the Program were actually guaranteed. Bk. Dkt. No. 64-6 at 3-4. Nevertheless, ostensibly,

---

[18] This interest rate is significantly higher than the highest interest rate approved in the guaranty agreement allegedly applicable to Medina's Loan. *See* Bk. Dkt. No. 64-7 at 42 (listing the highest APR at 8.72%)

- 9 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT                    20-CV-1912-BEN-MDD

JPMorgan would be bound by this Guaranty with TERI after its merger with Bank One, insofar as it continued to make loans under the Program. Similarly, the Guaranty would govern loans made under the Program even if ownership were transferred.

The Trust purportedly purchased Medina's Loan in 2006, but there is insufficient evidence to demonstrate a complete chain in title. The evidence (or lack thereof) is as follows:

(1) A Note Purchase Agreement ("NPA") was allegedly executed on September 30, 2003 between FMC and JPMorgan. *See* Bk. Dkt. No. 64-8 at 1 (referencing NPA). The Trust has not provided a copy of this NPA nor has Plaintiff been able to discover it, therefore it is unknown what loans (or loan programs) the NPA covered.

(2) There were purportedly loans subject to a NPA dated May 1, 2002 between FMC and Bank One. Bk. Dkt. No. 64-9 at 9 (referencing NPA). The Trust has not provided a copy of this NPA.

(3) A Pool Supplement ("Pool") was executed on September 28, 2006 between FMC and JPMorgan, transferring certain loans from JPMorgan to The National Collegiate Funding LLC ("National Collegiate"). Bk. Dkt. No. 64-8. The Pool incorporates the September 30, 2003 NPA, but it was not produced, and no schedules are attached to the Pool to demonstrate which loans or loan programs were included in the transfer of ownership from JPMorgan to National Collegiate.[19] There is no evidence that Medina's Loan or other loans in the Program were included in this Pool for transfer from JPMorgan to National Collegiate.

(4) On September 28, 2006, a Deposit and Sale Agreement ("DASA") was executed between National Collegiate and the Trust. Bk. Dkt. No. 64-9. That DASA purports to transfer from National Collegiate to the Trust certain "EDUCATION ONE" loans subject to a September 28, 2006 Pool between FMC and JPMorgan, as well as "EDUCATION ONE" loans subject to a May 1, 2002 NPA between FMC and Bank One. *Id.* at 7, 9. Because the only Pool produced is incomplete and does not reference

---

[19] The only reference included in the Pool is to a "Chase Extra$^{SM}$ Conforming Loan." *Id.* at 1. The Trust has not provided evidence that such loans are inclusive of Medina's Loan or Medina's Loan Program.

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

Education One loans, *see, supra*, ¶ 3, and the referenced NPA was not provided, *see, supra*, ¶ 2, there is insufficient evidence to give effect to the DASA as it concerns Medina's Loan or Loan Program (*i.e.*, it is impossible to determine which loans were transferred from National Collegiate to the Trust without knowing which loans were transferred to/owned by National Collegiate).

(5) A Trust Agreement between TERI and the Trust was executed on September 28, 2006. Bk. Dkt. No. 64-10. It incorporates a May 1, 2002 NPA between FMC and Bank One that has not been provided, *see, supra*, ¶ 2, as well as the Guaranty between TERI and Bank One. *Id.* at 32-33. It does not mention the September 28, 2006 Pool between FMC and JPMorgan, nor is there any reference that would indicate its applicability to Medina's Loan or Loan Program.

(6) A DASA between TERI, FMC, and the Trust was executed on September 28, 2006 and incorporates the same documents as the Trust Agreement. Bk. Dkt. No. 64-11.

Accordingly, the Trust's documents purportedly demonstrating its ownership of the debt do not specifically reference Medina's Loan (or Loan Program). More concerningly, in the absence of a NPA or a Pool that references specific loans or loan programs, there is absolutely no evidence on record that any loans made under Medina's Loan Program were actually transferred from JPMorgan to National Collegiate (so as to be capable of transfer to the Trust).

TERI filed its petition for reorganization under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Massachusetts in 2008, and the Fourth Amended Plan was confirmed on October 29, 2010. Bk. Dkt. No. 66-3. In TERI's bankruptcy, all guaranty agreements executed in favor of the Trusts were deemed rejected. Bk. Dkt. No. 70 at 50. In exchange, TERI paid out amounts in excess of the anticipated default rates of outstanding loans to the lenders and owners of the loans. Bk. Dkt. No. 66-2 at 53.

Medina filed her voluntary petition for Chapter 7 relief under the Bankruptcy Code on August 31, 2017 and properly scheduled her Loan. *In re Medina*, No. 17-

- 11 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

BK-05276-LT (Bankr. S.D. Cal. filed Aug. 31, 2017), ECF No. 1. On November 28, 2017, the Bankruptcy Court ordered discharge of Medina's pre-petition debt and the Trust was notified of discharge. *Medina*, No. 17-BK-05276-LT (Bankr. S.D. Cal. filed Nov. 28, 2017), ECF No. 16. It did not file an adversary proceeding to contest the debt's dischargeability. But instead, the Trust continued to collect and to attempt to collect on the debt.

### III.   Procedural History

Medina filed her adversary complaint for determination of discharge in the Bankruptcy Court on June 28, 2019. Bk. Dkt. No. 1. The Trust answered on July 25, 2019, Bk. Dkt. No. 4, and the Parties engaged in discovery in late 2019. The Trust moved for summary judgment on January 9, 2020, Bk. Dkt. No. 22, Medina filed her opposition on January 23, 2020, Bk. Dkt. No. 29, and the Trust filed a reply on February 24, 2020. Bk. Dkt. No. 36. Numerous supplemental briefs with exhibits were filed. *See, e.g.*, Bk. Dkt. Nos. 37, 42, 46, 47, 50, 52, 56, 64, 66-72. A tentative ruling was entered by the Bankruptcy Court on August 4, 2020, and the Bankruptcy Court heard oral argument on the motion on August 5, 2020. Bk. Dkt. Nos. 74, 77. On September 10, 2020, the Bankruptcy Court filed its Decision in favor of the Trusts. Dkt. No. 1-2; Bk. Dkt. No. 83.

### SUMMARY OF ARGUMENT

Section 523(a)(8)(A)(i) does not except from discharge loans made under a program guaranteed by corporate nonprofits as held by the Bankruptcy Court. Exceptions to discharge must be narrowly construed in favor of the debtor and such a broad reading of the statute conflicts with this principle and the plain text, canons of statutory interpretation, and legislative history. Section 523(a)(8)(A)(i) contains two distinct exceptions from discharge and the exception for loans made under a program "funded" by a nonprofit institution does not apply to loans made under a program guaranteed by a corporate nonprofit.

- 12 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

Even if such a broad interpretation of Section 523(a)(8)(A)(i) were proper, the Bankruptcy Court did not apply the correct legal standard for summary judgment. The Bankruptcy Court failed to recognize that the Guaranty was voided prior to Medina's bankruptcy when assessing the applicability of Section 523(a)(8)(A)(i). Despite citing evidence postdating the origination of Medina's Loan that TERI purchased a loan in another loan program, allegedly pursuant to the Guaranty,[20] the Bankruptcy Court improperly referenced Medina's Loan's origination date to conclude loans in Medina's Loan Program are guaranteed by TERI. Additionally, there is insufficient evidence that loans in the Program were ever guaranteed and that the Trust actually owns Medina's Loan, or to establish that TERI was a *bona fide* nonprofit.

## **ARGUMENT**

## I.  **Section 523(a)(8)(A)(i) does not except from discharge loans made under programs guaranteed by TERI.**

### A. **Exceptions to discharge must be narrowly construed in favor of the debtor.**

Exceptions to discharge, including those under Section 523(a)(8), are to be construed narrowly—liberally in favor of the debtor and strictly against the creditor. *Christoff*, 527 B.R. at 629 (citing cases); *In re Crocker*, 941 F.3d 206, 217 (5th Cir. 2019), *as revised* (Oct. 22, 2019) ("All exceptions to discharge [including those under Section 523(a)(8)] are to be interpreted narrowly in favor of the debtor to preserve the 'fresh start' the Bankruptcy Code provides for debtors.").[21] Despite this

---

[20] Bk. Dkt. No. 64-1 at 7; Bk. Dkt. No. 64-13; Bk. Dkt. No. 74 at 7-8; Bk. Dkt. No. 83 at 8.

[21] The Fifth Circuit in *Crocker* noted that there is no presumption of non-dischargeability for education loans. *Id.* at 218 n.8 ("We quote what might seem to be authority that the opposite presumption applies to education loans. Though referring to a party's argument, the Supreme Court could be seen as agreeing that

- 13 -

fundamental principle, designed to provide debtors with a fresh start, the Bankruptcy Court applied the broadest possible interpretation to Section 523(a)(8)(A)(i), liberally in favor of the creditor-Trust, and strictly against the debtor-Plaintiff. Such a determination conflicts with the rules of interpretation and is inconsistent with the established burden of the creditor to demonstrate that a loan is not discharged in bankruptcy. *In re McDaniel*, 973 F.3d 1083, 1092 (10th Cir. 2020) (citing cases); *In re Roth*, 490 B.R. 908, 916 (B.A.P. 9th Cir. 2013) ("Under § 523(a)(8), the lender has the initial burden to establish the existence of the debt and that the debt is an educational loan within the statute's parameters.").[22]

**B. The exception for loans made under programs "funded" by "nonprofit institutions" does not except loans made under programs guaranteed by TERI.**

Two distinct categories of debt are excepted from discharge under Section 523(a)(8)(A)(i):

(1) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or

(2) [an educational benefit overpayment or loan] made under any program funded in whole or in part by a governmental unit or nonprofit institution.[23]

The first exception does not reference nonprofit institutions, demonstrating that Congress did not intend to except from discharge loans guaranteed by nonprofit institutions. The second exception does not use the word "guaranteed," indicating

---

Congress made 'student loan debt presumptively nondischargeable.' ... In context, though, the Court is referring only to education loans from states.") (quoting *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 450 (2004)).

[22] *See also Hazelton v. UW-Stout*, No. 18-CV-159-JDP, 2019 WL 413567, at *3 (W.D. Wis. Feb. 1, 2019), *appeal dismissed,* 952 F.3d 914 (7th Cir. 2020).

[23] *See* 20 U.S.C. § 1019(3) ("The term 'education loan' (except when used as part of the term 'private education loan') means—(A) any loan made, insured, or guaranteed under part B of subchapter IV; (B) any loan made under part D of subchapter IV[.]").

- 14 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

that Congress did not intend to except from discharge loans made under programs guaranteed by nonprofit institutions. Nevertheless, the Bankruptcy Court broadly interpreted Section 523(a)(8)(A)(i) to include loans made under a program *guaranteed* by a nonprofit institution, by concluding that "funded" includes "guaranteed." This determination is inconsistent with the principles for interpreting discharge exceptions. "Funded" should not be interpreted broadly to include "guaranteed." And "nonprofit institution" was not intended to include all 501(c) organizations.

The tools for interpreting statutory text do not weigh in favor of reading Section 523(a)(8)(A)(i)'s second clause to mean "guaranteed" loans. There are four categories of tools for interpreting statutes: (1) the text of the statute, (2) legal interpretations of the statute, (3) the context and structure of the statute, and (4) the purpose of the statute. The Bankruptcy Court, in concluding that the word "funded" as used in the second part of Section 523(a)(8)(A)(i) could also mean "guaranteed," relied solely on case law wherein "funded" was interpreted to mean "played any meaningful part." These cases—based on antiquated principles developed by the first courts to grapple with the subject matter over thirty years ago—should not drive the Court's analysis today. The other tools for statutory interpretation, as well as a recent decision from the Office of the Comptroller of the Currency ("OCC"), demonstrate that the word "funded" does not mean "guaranteed" and such a broad interpretation of Section 523(a)(8)(A)(i) is improper.

       1. *The text of the statute does not support reading "funded" to mean "guaranteed."*

First, the text of the statute does not support a reading of "funded" to mean "played any meaningful part" or "guaranteed." An ordinary or reasonable understanding of "funded" would not connote such a broad understanding, nor would the dictionary definition denote one. "Funded" is the past tense and past participle of the verb "fund," which means "to furnish (as an institution) with a

- 15 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

regular source of income" or "to provide money for." *Fund*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/fund (last visited Oct. 9, 2020).[24] There is no ambiguity that, in order to "fund" a person or thing, actual capital must be bestowed upon that person or thing. One cannot "fund" a program simply by providing good will or emotional support—the definition is clear that income must be furnished, or money provided.[25]

"Funded" cannot mean "guaranteed" because "funded" requires that money or income has already exchanged hands, whereas "guaranteed" does not. "Guaranteed" is the past tense and past participle of the verb "guarantee," which means, in relevant part, "to undertake to answer for the debt, default, or miscarriage of"; "to engage for the existence, permanence, or nature of, undertake to do or secure"; or "to give security to." *Guarantee*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/guarantee (last visited Oct. 9, 2020). The two are not interchangeable. "Guaranteed" indicates a promise for future payment, but the word does not necessitate that money ever exchange hands (either because fulfillment of the guarantee is never sought or because it is made

---

[24] *See also In re Stewart*, 592 B.R. 414, 438 (B.A.P. 1st Cir. 2018), *vacated and remanded on other grounds,* 948 F.3d 509 (1st Cir. 2020) ("[T]he bankruptcy court appears to have ignored the plain meaning of the word, 'fund,' which, in its verb form, means 'to allocate or provide funds for ... a project ....'") (citation omitted).

[25] Even the first case to consider the issue seems to acknowledge that money must be provided to "fund" a program. *See In re Hammarstrom*, 95 B.R. 160, 165 (Bankr. N.D. Cal. 1989) ("I conclude that by using the broad language 'made under any program funded in whole or in part by ... a nonprofit institution,' Congress intended to include within section 523(a)(8) all loans made under a program in which a nonprofit institution plays any meaningful part *in providing funds*.") (citation omitted) (emphasis added).

- 16 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

impossible), whereas "funded" commands that the exchange of money has already occurred.[26]

### 2. Legal interpretations of Section 523(a)(8)(A)(i) should be revisited.

Second, though case law may support a broad reading of "funded," these legal interpretations all hinge on an antiquated approach to Section 523(a)(8) and student debt. Plaintiff believes that it is time to revisit this line of reasoning and requests that this Court depart from the trend amongst other courts to simply rule based on existing precedent, without any independent analyses. A departure from existing case law on the subject matter is not so farfetched: For many years, courts ruled that private student loans were all nondischargeable absent undue hardship as "funds received as an educational benefit" under Section 523(a)(8)(A)(ii) (formerly Section 523(a)(8)),[27] until a handful of courts began to reassess the statute and concluded that this subsection did not apply to private student loans. Though this understanding

---

[26] Courts have recognized this distinction in other contexts. For example, in *Grojean v. Commissioner*, 248 F.3d 572 (7th Cir. 2001), the plaintiff borrowed $10 million for one of his portfolio companies and, in lieu of an express personal guaranty of the debt, it was instead structured as two separate loans—one for $8.4 million to the company and one for $1.2 million to the plaintiff (to be used to purchase a participation interest in the loan to the company). *Id.* at 572-73. After the company sustained losses, the plaintiff claimed a tax deduction of $1.2 million, representing the portion he had liability on. The IRS rejected the plaintiff's claim, concluding that the $1.2 million was not a loan to the company, but only a guaranty. *Id.* at 573. The Seventh Circuit affirmed, noting that the difference between a loan and a guaranty "is not trivial or nominal ('formal')." *Id.* The court acknowledged that, "[a]t a high enough level of abstraction, … the difference between providing [or lending] and enabling [or guaranteeing] the provision of funding may disappear. … But at the operational level, … there really is a substantive and not merely a formal difference between lending and guaranteeing." *Id.* at 574.

[27] *See, e.g.*, *In re Goldstein*, No. 11-81255-MGD, 2012 WL 7009707, at *3 (Bankr. N.D. Ga. Nov. 26, 2012); *In re Roy*, No. 08-33318, 2010 WL 1523996, at *1 (Bankr. D.N.J. Apr. 15, 2010); *In re Skipworth*, Adv. No. 09-80149-JAC-7, 2010 WL 1417964, at *2 (Bankr. N.D. Ala. Apr. 1, 2010).

- 17 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

of Section 523(a)(8) is now widely accepted, including at the appellate level, *see, e.g.*, *McDaniel*, 973 F.3d at 1086; *Crocker*, 941 F.3d at 224, such open mindedness had to start in the district and bankruptcy courts. *See, e.g.*, *In re Nypaver*, 581 B.R. 431, 437 (Bankr. W.D. Pa. 2018); *In re Essangui*, 573 B.R. 614, 622 (Bankr. D. Md. 2017); *In re Christoff*, 510 B.R. 876, 884 (Bankr. N.D. Cal. 2014), *aff'd*, 527 B.R. 624 (B.A.P. 9th Cir. 2015).

The earliest decision interpreting "funded" as used in Section 523(a)(8)(A)(i) dates back to 1989. *See In re Hammarstrom*, 95 B.R. 160 (Bankr. N.D. Cal. 1989). *Hammarstrom* did not concern nonprofit guarantees conditioned on default, but rather an agreement between a private bank and Nellie Mae (a nonprofit entity) pursuant to which Nellie Mae would purchase student loans immediately after issuance. After assessing a mere fraction of the legislative history, the court "conclude[d] that by using the broad language 'made under any program funded in whole or in part by ... a nonprofit institution,' Congress intended to include within section 523(a)(8) all loans made under a program in which a nonprofit institution plays any meaningful part in providing funds." *Id.* at 165. This decision—factually distinguishable and based on undeveloped reasoning (that Congress's use of "any program" justified a broad reading of the entire exception)—has directly or indirectly served as the basis for nearly every court's decision on this issue. *Hammarstrom* continues to be cited as precedent over thirty years after its issuance in 1989 and was cited by the Bankruptcy Court below.

Other early decisions that still define today's case law are based on concerns dating back to 1978 for commercial lenders engaged in educational loan programs. *See, e.g.*, *In re Merchant*, 958 F.2d 738, 742 (6th Cir. 1992) ("Congress enacted 11 U.S.C. § 523(a)(8) in an effort to prevent abuses in and protect the solvency of the educational loan programs. … Congress, by excepting educational loans from discharge, has determined that the continued solvency of educational funding and

- 18 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

financial aid programs override the need to provide debtor's with a fresh start in their financial affairs.").[28] *See also In re Pilcher*, 149 B.R. 595, 598 (B.A.P. 9th Cir. 1993) ("Our reading is also consistent with the general legislative policy behind the enactment of § 523(a)(8), which was to curb abuses of the educational loan system by restricting the ability of a student to discharge an educational loan by filing bankruptcy shortly after graduation, and to safeguard the financial integrity of educational loan programs.") (citing 124 Cong. Rec. 1791-94 (1978)).[29] Concerns based on the state of educational lending in 1978 should not continue to drive case law in 2020.

Specifically, concerns of students abusing the educational lending system may have been relevant in 1978 given the need to increase available avenues for financing education and the Bankruptcy Code at that time. However, the Bankruptcy Code was modified to prevent such abuses. And these concerns should not continue to dominate in 2020, when the student debt crisis has escalated (and continues to escalate) exponentially as a result of commercial entities abusing the Bankruptcy Code by issuing and profiting on commercial credit agreements disguised as nondischargeable educational loans. The lending program relevant to the instant

---

[28] *See also id.* at 740 ("The … exclusion of educational loans from the discharge provisions was designed to remedy an abuse by students who, immediately upon graduation, filed petition for bankruptcy and obtained a discharge of their educational loans. This was due to the fact that unlike commercial transactions where credit is extended based on the debtor's collateral, income, and credit rating, student loans are generally unsecured and based solely upon the belief that the student-debtor will have sufficient income to service the debt following graduation.") (citing H.R. Rep. 95-595, 95th Cong. 1, 466-75 (1978)).

[29] *Pilcher* also relied on *Hammarstrom* in its decision, as well as legislative history, but concerningly misquoted the 1979 version of the statute in its opinion. *See id.* ("The subsection was amended in 1979 to expand the coverage of obligations to include 'educational loan[s] made, insured, or guaranteed by a governmental unit, or part by a governmental unit or nonprofit institution of higher education.'").

- 19 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

1    appeal has nothing to do with increased opportunities for students to affordably fund

2    their education.[30] It was an attempt by commercial entities to securitize student loan

3    debt in the same way that residential mortgages had been transformed into the

4    mortgage-backed securities that led to the 2007 banking crisis, the 2008 financial

5    crisis, and the Great Recession.[31] Plaintiff doubts that Congress in 1978 intended to

6    protect such commercial entities that profit on predatory lending schemes, but asserts

7    that these historical concerns in particular should not continue to serve as the

8    justification for current case law.

9         Plaintiff also notes that the formative case law on the subject matter predates

10   the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005's addition

11   to Section 523(a)(8), wherein educational loans (including those made by private

12   entities) became nondischargeable if they were "qualified education loans" under

13   Section 523(a)(8)(B). The pre-2005 decisions interpreting "funded" so broadly

14

15   [30] Note that the financing for Medina's Loan of $30,000 would cost her $64,519.20

16   in interest alone at a 12.060% annual percentage rate (APR), disclosed to her only

17   after receipt of the funds. Bk. Dkt. No. 64-2. Unlike federal student loan interest

18   rates that range from 5% to 7% (including those disbursed in 2006), there was

     nothing "affordable" about Medina's Loan. Medina's APR was and still is

19   comparable to credit card interest rates, which averaged around 14% in 2006 and

     have since declined.

20   [31] *In re Mata*, No. 6:13-BK-30625-MH, 2020 WL 5543716, at *1-2 (Bankr. C.D.

21   Cal. July 31, 2020) ("[I]n 2001, First Marblehead established a financial plan under

22   which banks would offer private student loans, and the notes would be purchased by

     [the NCSLTs.] The loans … would be, at least ostensibly, guaranteed by TERI, in

23   order to preclude the loans from being discharged, and the NCSLTs would then be

24   offered on the open market for investment. [] The banks involved in the funding of

     these loans include JP Morgan, HSBC, Citizens, PNC, and … Charter One, among

25   many others. There were 15 NCSLTs in total, owning more than 800,000 private

26   loans totaling billions of dollars. … Beginning in 2005, First Marblehead began

     creating new loan product lines aimed at borrowers with riskier credit scores. … As

27   the economy began its downturn in 2007, default rates began rapidly increasing,

28   resulting in the eventual bankruptcy of TERI in 2008.") (citations omitted).

- 20 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

underscore an attempt by the courts to protect early private companies engaged in education financing at a time when the Bankruptcy Code did not so explicitly provide for their protection. Perhaps this broad reading by the courts was justified prior to the addition of Section 523(a)(8)(B) (many of the pre-2005 decisions concern debts that would likely be nondischargeable under the subsection), but this expansive understanding of "funded" that originated in 1989 is certainly not appropriate now.

The OCC's recent rule is consistent with Plaintiff's insistence that these legal interpretations represent an outdated understanding of the word "funded" as used in Section 523(a)(8)(A)(i). On October 27, 2020, after the Bankruptcy Court issued its Decision, the OCC issued its guidance on, *inter alia*, the meaning of the word "funded" in the context of loan originations governed by federal law. *See National Banks and Federal Savings Associations as Lenders*, 85 FR 68742-01. The OCC explicitly rejected an expansive understanding of the word:

> [F]unding [] does not include certain lending or financing arrangements such as warehouse lending, indirect auto lending (through bank purchases of retail installment contracts (RICs)), loan syndication, and other structured finance. … For example, when a bank purchases a RIC from an auto dealer, as is often the case with indirect auto lending, the bank does not "fund" the loan.[] When a bank provides a warehouse loan to a third party that subsequently draws on that warehouse loan to lend to other borrowers, the bank is not funding the loans to these other borrowers.

*Id.*

The Bankruptcy Court issued its Decision without the benefit of the OCC's more recent guidance on this matter, relying instead on reasoning that dates back to 1989. The District of Colorado recently reversed on appeal a decision of the bankruptcy court that had similarly sided with the Second Circuit, citing a recent OCC ruling as support. *See In re Rent-Rite SuperKegs W. Ltd.*, No. 19-CV-01552-RBJ, 2020 WL 6689166, at *4 (D. Colo. Aug. 12, 2020) ("[T]he [OCC] in the U.S.

- 21 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

Department of Treasury recently finalized a rule that upholds the valid-when-made rule in the instant context. … The rule is expressly reactionary to 'the legal uncertainty created by the *Madden* decision.' … It was issued after the briefing and the decision by the Bankruptcy Court in this case.") (citations omitted). This Court should likewise apply the OCC's clarification of the word "funded" to this case now that the OCC has fulfilled its role of providing clarity under federal banking law.

### 3. The context and structure of Section 523(a)(8)(A)(i) demonstrate that "funded" does not mean "guaranteed."

Third, the context and structure of Section 523(a)(8)(A)(i) demonstrate that "funded" does not mean "guaranteed." Canons of construction favor a narrower reading of "funded." Namely, the presumption of meaningful variation instructs that when the legislature departs from the consistent usage of a particular term, the legislature intends for that particular term to have a different meaning. *Bates v. United States*, 522 U.S. 23, 29-30 (1997) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Congress used "made, insured, or guaranteed by" in the first part of Section 523(a)(8)(A)(i), but used "made under any program funded … by" in the latter part of the subsection. Congress could have included "guaranteed" in the second part of the subsection but did not. Indeed, the 1978 version of Section 523(a)(8)(A)(i) treated debts for educational loans to governmental units and nonprofit institutions of higher education the same,[32] and Congress specifically sought to fix that in the 1979 version.

---

[32] *See* Act of Nov. 6, 1978, Pub. L. No. 95-598, § 523(a)(8), 92 Stat. 2549 (1979) ("[A] discharge … does not discharge an individual debtor from any debt … to a governmental unit, or a nonprofit institution of higher education, for an educational loan.").

- 22 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

As demonstrated elsewhere in the Bankruptcy Code, Congress knew how to distinguish those that fund loan programs from those that play a secondary role in a loan program. *See* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 313, 108 Stat. 4106 (11 U.S.C. § 525(c)(1) (1994)) (distinguishing a "governmental unit that operates a student grant or loan program" from "a person engaged in a business that includes the making of loans guaranteed or insured under a student loan program"). Case law has also acknowledged this distinction. *See, e.g.*, *United States v. Diwre*, 872 F.2d 431 (9th Cir. 1989) ("Diwre obtained at least five federally-guaranteed student loans and three federally-funded student grants[.]"); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 31 F.C.C. Rcd. 9074, 9082 n.54 (2016) (stating that Congress did not intend the phrase "owed to or guaranteed by" as used in the Budget Act to include debts "insured, … coinsured, or reinsured, in whole or in part").[33]

### 4. The purpose of Section 523(a)(8)(A)(i) weighs against broadly interpreting "funded."

The last tool for statutory interpretation—the purpose of the statute—also weighs against the broad interpretation of "funded." The legislative history of Section 523(a)(8)(A)(i) reveals that the two clauses within the subsection were intended to cover the two types of federally subsidized education loans in existence at the time the statute was drafted (GSLs and NDSLs). Relevant here, the language in the 1984 version of Section 523(a)(8) is essentially the current version of Section

---

[33] Importantly, the government does not allow the OMB, agencies, or contractors to transform a loan guarantee into a direct outlay of capital even when the guarantee is performed upon for budgeting purposes. 2 U.S.C. § 661a ("The term 'direct loan' means a disbursement of funds by the Government to a non-Federal borrower ... [t]he term does not include the acquisition of a federally guaranteed loan in satisfaction of default claims.").

- 23 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

523(a)(8)(A)(i),[34] and as discussed, *supra*, the 1984 version of the statute was only a slight modification to the 1979 version of Section 523(a)(8) (now Section 523(a)(8)(A)(i)).

The Congressional record from 1979 makes clear that the 1978 version of Section 523(a)(8) was enacted specifically to protect from discharge loans made under the GSL Program and the NDSL Program, and that the 1979 amendments were to perfect that protection of those Title IV Programs:

> 11 U.S.C. 523(a)(8) applied only to debts for educational loans owing to a governmental unit or to a nonprofit institution of higher education, it has a very uneven effect upon the student loan programs …. For example, national direct student loan (NDSL) funds are administered by both nonprofit and profitmaking institutions of higher education. Under the new law, a student who obtained an NDSL loan from a profit-making institution of higher education would be free to have that loan discharged in bankruptcy. In contrast, a student who obtained an NDSL loan from a nonprofit institution of higher education would be subject to the prohibitions contained in the new law. … The application … to loans made under the guaranteed student loan (GSL) … program[] would produce even more anomalous results. If the borrower of a GSL … loan filed a bankruptcy petition and the lender then holding the loan was a bank, savings and loan association, credit union, insurance company, pension fund, the student loan marketing association or … a profit-making institution of higher education, the loan would be fully dischargeable.

*See* S. Rep. 96-230, at 1-2 (1979); *see also In re Johnson*, 218 B.R. 449, 454 (B.A.P. 8th Cir. 1998) (analyzing legislative history of nondischargeable student loan debt).

Hence, the language employed in the 1979 version (and subsequently, the 1984 version) of Section 523(a)(8) perfectly encompasses the Title IV Programs. The first clause, for loans "made, insured, or guaranteed by a governmental unit,"

---

[34] It states, "a discharge … does not discharge an individual debtor from any debt— … for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a nonprofit institution." 11 U.S.C. § 523(a)(8) (1984).

- 24 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

was drafted to cover loans made under the GSL Program (which ultimately became the FFEL Program), consisting of loans made by private lenders but guaranteed against default by the federal government.[35] The second clause, for loans "made under any program funded in whole or in part by a governmental unit or nonprofit institution (of higher education)," was drafted to cover NDSLs, which ultimately became Perkins Loans.[36] NDSLs were (and Perkins Loans still are) provided by participating postsecondary institutions directly to students. Under the Perkins Loan Program, just as with the NDSL Program, the government provides a set amount of funds to each participating school for the school to award to students based on need. 20 U.S.C. § 1087aa *et seq.*; 20 U.S.C. § 1087aa *et seq.* (1976). The school may contribute its own money to those funds, though not required, such that the Perkins Loan Program at each participating school can be funded either in whole by the government, or in part by the government and in part by the school (including nonprofit institutions of higher education).[37] The Perkins Loan Program, like the

---

[35] In 2010, Congress ended the GSL, and all federal loans are now made through the Direct Program. The Direct Program, like the NDSL, is directly funded by the government, and because of the precision employed by Congress in drafting this statute, these loans remain protected under Section 523(a)(8)(A)(i).

[36] Similarly, the language Congress used for each clause mirrors the language it used in referring to the respective programs within Title IV: the phrase in the first clause, "loan made, insured or guaranteed," was used to describe the GSL Program in other statutes; *see, e.g.*, 14 U.S.C. § 2772(a)(1)(A); 20 U.S.C. § 1071 *et seq.*; and the NDSL Program is described throughout Title IV with language similar to that used in the second clause of Section 523(a)(8). *See, e.g.*, 20 U.S.C. §§ 1087cc, 1087dd, 1087gg.

[37] *Lee v. Bd. of Higher Ed. in City of New York*, 1 B.R. 781, 782 n.1 (S.D.N.Y. 1979) ("The NDSL program provides needy students with financial assistance. Under NDSL, the federal government furnishes 90% of the loan, the university provides the remaining 10%, and the university is charged with collection.") (citing 20 U.S.C. § 1087aa *et seq.* (1976)).

- 25 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

NDSL Program, does not provide for guarantees by governmental units or nonprofit institutions.

The legislative history of Section 523(a)(8)(A)(i) therefore demonstrates that it applies to two distinct types of debt, representative of the Title IV Programs of the HEA, excepting from discharge "an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit" (GSL), or "[an educational benefit overpayment or loan] made under any program funded in whole or in part by a governmental unit or nonprofit institution" (NDSL). The legislative history in no way indicates that the second clause—designed to protect NDSLs—might provide an exception to discharge for loans made under programs *guaranteed* by nonprofit institutions. Accordingly, the purpose of Section 523(a)(8)(A)(i), as demonstrated by its legislative history, confirms that "funded" does not mean "guaranteed."

5. *"Nonprofit institution" was not intended to apply to entities like TERI.*

The legislative history additionally demonstrates that "nonprofit institution" was not intended to apply to all 501(c) organizations. The 1978 and 1979 versions of the statute both referenced a "nonprofit institution of higher education." However, in 1984, "of higher education" was omitted in response to courts having difficulty determining what constituted an "institution *of higher education*." Congress explained that the amendment was merely to resolve this debate.[38] Contrary to what

---

[38] *See also Bankruptcy Improvements Act: Hearing on S. 333 and S. 445 Before the S. Comm. On the Judiciary*, 98th Cong. 1, 328-29 (1983) (statement of Professor Frank R. Kennedy, Univ. of Mich. Sch. of Law, Ann Arbor, Mich.), 1983 WL 506604, at 172-73 ("[D]eleting 'of higher education' enlarges the scope of the nondischargeability exception and is therefore substantive to that extent. It is a modest enlargement, however, in that the claimant must be a nonprofit institution and the loan must be one for an educational loan. The change eliminates litigation over the question whether a seminary, for example, is an institution of higher education. The amendment is thus to some extent at least clarifying.").

- 26 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT                    20-CV-1912-BEN-MDD

later case law would conclude,[39] this amendment was only a "modest enlargement" to the statute's substantive scope. Congress deleted the phrase "of higher education," but this did not change the meaning of the term "nonprofit institution." *See McClure v. United States*, 95 F.2d 744, 750 (9th Cir. 1938) ("Where an amendment leaves certain portions of the original act unchanged, such portions are continued in force with the same meaning and effect they had before amendment.").[40] The term "institution" means a "scholastic institution" rather than any organization or corporation; the HEA statutes and regulations consistently use the term "institution" as a shorthand for college, university, or vocational school.[41] Consequently, "nonprofit institution" should not be read to include all 501(c) organizations.

## II.   Section 523(a)(8)(A)(i) does not except from discharge Medina's Loan.

### A. The Bankruptcy Court must view the evidence in the light most favorable to Plaintiff, as nonmovant.

It is the Trust's burden to prove Medina's Loan is non-dischargeable. *In re Conti*, No. 20-1172, 2020 WL 7331502, at *2 (6th Cir. Dec. 14, 2020); *McDaniel*, 973 F.3d at 1092; *Roth*, 490 B.R. at 916.[42] "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at

---

[39] *See, e.g.*, *In re Goldstein*, No. 11-81255, 2012 WL 7009707, at *3 (Bankr. N.D. Ga. Nov. 26, 2012).

[40] *See also Muniz v. Hoffman*, 422 U.S. 454, 468 (1975) ("We cannot accept the proposition that Congress, without expressly so providing, intended … to change the [scope of the statute.] … Just as [the section] may not be read apart from other relevant provisions of the labor law, that section likewise may not be read isolated from its legislative history and the revision process from which it emerged[.]").

[41] *See, e.g.*, 34 C.F.R. §§ 668.1(a) & (b), 668.14.

[42] *In re Dickerson*, 510 B.R. 289, 305 n.8 (Bankr. D. Idaho 2014) ("If Collection is in doubt as to the status of any debts … it … may commence an adversary proceeding in this Court to obtain a formal determination of dischargeability as to those debts.").

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT                          20-CV-1912-BEN-MDD

1  trial." *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480
2  (9th Cir. 2000) (internal quotation mark and citation omitted). "[T]he moving party
3  has the initial burden of establishing the absence of a genuine issue of fact on each
4  issue material to its case." *Id.* (citation omitted). "If the moving party fails to meet
5  its initial burden, summary judgment must be denied and the court need not consider
6  the nonmoving party's evidence." *Lucas v. Bell Trans*, 773 F. Supp. 2d 930, 934 (D.
7  Nev. 2011) (citation omitted).[43]

8  **B. There is a genuine issue of material fact as to whether TERI actually**
   **guaranteed Medina's Loan or Loan Program.**
9

10      Even if Section 523(a)(8)(A)(i) is interpreted to exclude from discharge loans
11  made under programs guaranteed by nonprofit institutions such as TERI (it should
12  not be), the evidence demonstrates that Medina's Loan Program was not guaranteed
13  by TERI at the time she filed for bankruptcy. And a review of the evidence
14  establishes a genuine issue of material fact as to whether any of the loans in Medina's
15  Loan Program were ever guaranteed by TERI, as the Guaranty was only conditional.
16  *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (failure to verify
17  that the evidence actually supports the material facts as stated in a motion for
18  summary judgment "would derogate the truth-finding functions of the judicial
19  process by substituting convenience for facts"). Further, the Trust has shown that
20  there is an incomplete chain of title as to Medina's Loan such that it was never bound
21  by the Trust Agreement between TERI and the Trust.

22

23

24  _____
    [43] "If the moving party satisfies its initial burden, the burden then shifts to the
25  opposing party to establish that a genuine issue of material fact exists. … [T]he
26  opposing party need not establish a material issue of fact conclusively in its favor. It
    is sufficient that the claimed factual dispute be shown to require a jury or judge to
27  resolve the parties' differing versions of the truth[.]" *Id.* (internal quotation marks
28  and citations omitted).

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT                    20-CV-1912-BEN-MDD

### 1. *Medina's Loan Program was not guaranteed at the time she filed bankruptcy and the petition date controls.*

Assuming *arguendo* that any of the loans in Medina's Loan Program were guaranteed by TERI, the loans (and the Loan Program) certainly were not guaranteed by TERI when Medina sought relief under the Bankruptcy Code on August 31, 2017. Particularly, the Bankruptcy Court noted that TERI guaranteed loans in Medina's Loan Program under the 2002 Guaranty between Bank One and TERI. Bk. Dkt. No. 83 at 4 (citing Bk. Dkt. No. 64-6). Medina's Loan post-dated the Guaranty, as it was disbursed in June 2006. TERI filed its bankruptcy petition in 2008, and all guaranty agreements were thereafter deemed rejected. Bk. Dkt. No. 70 at 50; *see also* Bk. Dkt. No. 64-6 at 13-14 (the Guaranty itself states that it is automatically terminated without notice in the event that TERI becomes subject to bankruptcy). As part of the Fourth Amended Plan confirmed in October 2010, guaranty fees were refunded to the loan originators and trusts, including Defendant, and an additional payment was made to settle all claims on individual loans. Bk. Dkt. No. 66-2 at 53.[44] When Medina filed her bankruptcy petition in 2017, any guaranty agreement that may have been applicable to her Loan or Loan Program was no longer in effect.

The Bankruptcy Court therefore had to rely on a pre-petition (and pre-2010) date to conclude that TERI "guaranteed the loans in Plaintiff's Loan Program, the Education One© Education One Continuing Education Loan Program,"— presumably, it applied Medina's June 2006 Loan origination date. Bk. Dkt. No. 83 at 4. In doing so, the Bankruptcy Court implicitly held that the origination date of Medina's Loan—rather than Medina's petition date—governs whether loans in Medina's Loan Program are guaranteed by TERI for purposes of determining

---

[44] The borrowers did not receive any setoff or credit for the amounts paid by TERI to the banks and trusts to settle all claims regarding the borrowers' individual loans.

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

whether Medina's Loan is a non-dischargeable debt. The Bankruptcy Court did not cite any case law in support of this view.

The petition date—not the loan origination date—governs a dischargeability determination under Section 523(a)(8).[45] Section 523(a)(8) concerns dischargeable debts. *See* 11 U.S.C. § 523(a)(8) ("A discharge … does not discharge an individual debtor from any debt … unless excepting such debt from discharge … would impose an undue hardship …."). It is therefore *debts*—and not loans—that are dischargeable (or not) under Section 523(a)(8). "The term 'debt' means liability on a claim." *Id.* § 101(12). "Claim" is defined by the Bankruptcy Code as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" *Id.* § 101(5)(A). "Claims" are held by "creditors." *Id.* § 101(10). A creditor's claim is fixed at the petition date. *In re Abdelgadir*, 455 B.R. 896, 903 (B.A.P. 9th Cir. 2011).[46] Of course, the value of the Trust's claim (alternatively stated as Medina's debt) was determined as of her 2017 petition date—not by the 2006 origination date of the Loan.

The proper inquiry for a dischargeability determination is thus whether, in 2017, Medina held a debt for a loan that is part of a program guaranteed by TERI. This approach was upheld by the Ninth Circuit Bankruptcy Appellate Panel under similar circumstances. In *Abdelgadir*, the bankruptcy court had interpreted the text

---

[45] *See, e.g.*, *In re Tremblay*, No. 11-09732-MMB, 2012 WL 2915367, at *2 (Bankr. S.D. Cal. July 16, 2012) ("The petition date is the watershed date of a bankruptcy proceeding; thus, creditors' rights are fixed (as much as possible) as of this date.") (internal quotation marks and citations omitted).

[46] *Guillermety v. Sec'y of Educ. of U.S.*, 241 F. Supp. 2d 727, 735 (E.D. Mich. 2002) ("[T]he Court [in *Marxen*] held that the debt was not a claim of the United States for priority purposes until the United States paid its insurance obligation[.]"); *see also United States v. Marxen*, 307 U.S. 200, 207 (1939) ("[T]he rights of creditors are fixed by the Bankruptcy Act as of the filing of the petition in bankruptcy.").

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT                    20-CV-1912-BEN-MDD

of 11 U.S.C. § 1123(b)(5), which states a confirmation plan in bankruptcy may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence," to indicate that the confirmation date—as opposed to petition date—governed determinations as to the creditor's claim. 455 B.R. at 902. Specifically, the bankruptcy court relied on the text's use of the present tense in the phrase, "property that *is* the debtor's principal residence" to conclude that the property is assessed at the time of the confirmation plan, not before. *Id.* This Court rejected that reasoning, noting:

> A narrow focus on sub-phrases, which modify antecedents within the clause, is misplaced. Based on the grammatical structure of the statute, the words "secured only by a security interest in real property that is the debtor's principal residence" modifies "claim" and describes the type of claim that is excepted from modification.
>
> …
>
> The plain language of § 1123(b)(5) excepts a particular type of claim from modification. … [A] creditor's right to payment, whether it later is deemed secured or unsecured depending on the value of the collateral, is fixed at the petition date. ... Therefore, our statutory analysis leads us to conclude that the determinative date for whether a claim is secured by a debtor's principal residence is, like all claims, fixed at the petition date.

*Id.* at 903. The same logic demands rejecting the Bankruptcy Court's conclusion that Medina's 2017 debt is for a loan made under a loan program that is guaranteed by TERI when all TERI guarantees were voided in 2010.

Accepting the Bankruptcy Court's application of the Loan origination date would lead to absurd results: lenders could prevent discharge of debts by establishing separate nonprofit corporations and providing borrowers with loans guaranteed by the nonprofit (and charging the borrower the guaranty fee paid to the "nonprofit"), then dissolving the nonprofit shortly thereafter with the fees refunded directly to the lender. The lender would retain the fee paid by the borrower and the debt would be forever nondischargeable. Though this hypothetical may sound ludicrous, this is

- 31 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

1   precisely the story—albeit simpler—of FMC and the TERI guarantees (and the

2   associated banks and trusts).

3        The Bankruptcy Court's implicit application of Medina's Loan origination

4   date for purposes of assessing dischargeability also contradicts its acceptance of

5   other evidence. Specifically, while the Bankruptcy Court held that performance on

6   a guaranty is not required for purposes of satisfying the "funded" aspect of Section

7   523(a)(8)(A)(i),[47] it stated that "TERI supplied unrefuted evidence that it did fund a

8   loan under the program." Bk. Dkt. No. 83 at 8; *see also* Bk. Dkt. No. 74 at 8 ("TERI

9   performed on its guaranty of a loan by purchasing that loan. Thus, Defendant has

10  provided 'evidence' of performance."). This "unrefuted evidence" consists of

11  documents pertaining to TERI's alleged performance on a guaranty of an Education

12  One© Education One Undergraduate Loan, Bk. Dkt. No. 64-13, disbursed on

13  August 18, 2006. *Id.* at 5. Plainly, if Medina's Loan origination date (June 2006)

14  governs dischargeability as the Bankruptcy Court implicitly held, evidence of a loan

15  disbursed, guaranteed, and paid after Medina's Loan origination is irrelevant for

16  determining dischargeability. Such evidence cannot demonstrate that, at the time

17  Medina's Loan was originated, loans in Medina's Loan Program were guaranteed

18  and paid by TERI.

19       As a final note, the Bankruptcy Court defined Medina's Loan Program as "the

20  Education One© Education One Continuing Education Loan Program." Bk. Dkt.

21  No. 83 at 4. The cited evidence pertains to the Education One Undergraduate Loan

22  Program. Bk. Dkt. No. 64-13 at 4-5. The Undergraduate Loan Program is not the

23  same as Medina's Loan Program (as defined by the Bankruptcy Court). Medina's

24  Loan Program and the Undergraduate Loan Program are separately defined, have

25  _____

26  [47] While Plaintiff generally opposes interpreting "funded" to include "guaranteed,"
    Plaintiff is incredulous at the Bankruptcy Court explicitly holding that a guaranty
27  *without performance* could constitute "funded" when the definition of "funded"
28  requires that income be furnished or money provided. *See, supra*, Section I.B.1.

- 32 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

different program codes, and have their own requirements and guidelines. Bk. Dkt. No. 64-6 at 2, 26, 36-38, 41-42. Thus, this evidence cannot demonstrate that loans under Medina's Loan Program were guaranteed and paid at any time.

### 2. The Guaranty is conditional and cannot establish that TERI guaranteed Medina's Loan or Loan Program.

The evidence submitted by the Trust is not only insufficient to satisfy its summary judgment burden as movant, it demonstrates a genuine issue of material fact as to whether the Guaranty is applicable to loans under Medina's Loan Program. In its tentative ruling, the Bankruptcy Court relied on an excerpt from *In re Greer-Allen*, where the Massachusetts bankruptcy court misleadingly quoted the relevant Guaranty to imply that it is unconditional. *See* Bk. Dkt. No. 74 at 6 (quoting *In re Greer-Allen*, 602 B.R. 831, 838-39 (Bankr. D. Mass. 2019)).[48] But the Guaranty is plainly conditional. The Guaranty indicates that TERI's guaranty of loans is conditioned upon four items:

a. Bank One must have filed its claim for guaranty payment … following the procedures specified in the Program Guidelines.
b. Bank One and its predecessors in interest must … have complied with all other material requirements of the Program Guidelines applicable to the Loan.
c. Bank One shall have paid to TERI the Initial Guaranty Fee … for the Loan in question ….
d. TERI must have received from Bank One the original Promissory Note, … endorsed to TERI in such manner as to transfer to TERI all rights in and title to such Promissory Note ….

---

[48] The *Greer-Allen* court quoted the Guaranty in part, stating: "Section 2.1 of the guaranty states that 'TERI hereby guarantees to Bank One, unconditionally ... the payment of 100% of the principal of and accrued interest on every Loan as to which a Guaranty Event has occurred.'" 602 B.R. at 839; *see also* Bk. Dkt. No. 74 at 6. Had the court included the full text of Section 2.1 rather than an ellipsis to imply that the Guaranty is unconditional, it reads: "TERI hereby guarantees to Bank One, unconditionally except as set forth in Section 2.2 below, the payment of 100% … on every Loan as to which a Guaranty Event has occurred." Bk. Dkt. No. 64-6 at 3.

- 33 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

Bk. Dkt. No. 64-6 at 4. Contrary to the Bankruptcy Court's conclusory statement that "TERI[] guarant[eed] all loans under the program," the Trust did not demonstrate that any loans in Medina's Loan Program (including Medina's Loan) fulfilled the aforementioned guaranty conditions. There is a genuine dispute of material fact as to whether TERI ever guaranteed loans made under Medina's Loan Program.

Additionally, the evidence before the Bankruptcy Court highlights that Medina's Loan was not originated in a manner approved by the Guaranty (and no additional evidence was provided to controvert this conclusion). Specifically, Section 3.2 of the Guaranty states:

> Bank One will use Promissory Notes, Loan applications, disclosure statements, and other forms to which the parties may agree from time to time in written, faxed, or e-mailed communications or documents. The forms of application and Promissory Note attached as part of the Program Guidelines, and the form of disclosure statement attached hereto as part of the Program Guidelines, are agreed to be satisfactory to both parties. … Bank One warrants the conformity of such instruments and any agreed successors thereto with all applicable and material legal requirements ….

Bk. Dkt. No. 64-6 at 7. As referenced in Section 3.2, attached to the Guaranty are approved applications, promissory notes, and disclosure statements, including those applicable to Medina's Loan Program. Bk. Dkt. No. 64-7 at 27-43.

Most concerningly, Medina's Loan application and corresponding Credit Agreement do not resemble the Guaranty's approved application and Promissory Note. For starters, they have different names—the approved documents refer to an "Application" and "Promissory Note" and Medina's Loan documents are simply referred to as the "Credit Agreement." *Compare* Bk. Dkt. No. 64-7 at 35-38 *with* Bk. Dkt. No. 64-3 at 3-6.

The certifications regarding TERI are also different. The approved Promissory Note reads, in relevant part:

- 34 -

OPENING BRIEF OF PLAINTIFF-APPELLANT
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

> I acknowledge that the requested loan may be subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code. Specifically, I understand that you have purchased a guaranty of this loan, and that this loan is guaranteed by The Education Resources Institute, Inc. ('TERI'), a non-profit loan guaranty agency.

Bk. Dkt. No. 64-7 at 37. The approved Promissory Note does not reference a loan program, but confirms the individual loan is guaranteed. On the other hand, Medina's Credit Agreement states, in relevant part:

> I acknowledge that the requested loan is subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code because either or both of the following apply: (a) this loan was made pursuant to a program funded in whole or in part by The Education Resources Institute, Inc. ('TERI'), a non-profit institution, or (b) this is a qualified education loan as defined in the Internal Revenue Code.

Bk. Dkt. No. 64-3 at 5. Unlike the approved Promissory Note, Medina's Credit Agreement does not confirm that her individual Loan is guaranteed, but states that the Loan *may* have been made pursuant to a loan program funded in whole or in part by TERI.

Finally, the Guaranty's approved documents include "Sample Loan Terms" that are made available to a loan applicant as part of the application materials. Bk. Dkt. No. 64-7 at 41-42. This document provides insight as to the loan's terms, including, *inter alia*, origination fee estimates, the LIBOR rate, possible APRs, and definitions of other key terms. *Id.* at 41. It also includes a chart demonstrating what financing may cost in certain scenarios with various APRs (none exceeding 8.72%). *Id.* at 42. There is no evidence that Medina received such a form or Sample Loan Terms in conjunction with her Note and Credit Agreement, as required by the Guaranty between Bank One and TERI. And her APR greatly exceeded 8.72%. Thus, there is a genuine dispute of material fact as to whether her Loan was guaranteed given that it did not follow the parameters of the Guaranty.

- 35 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

Even if Medina's Loan was guaranteed, and TERI "waived" the requirements under the Guaranty as to Medina's Loan, her Loan cannot be said to have been "made" under the identified "program," as her Loan does not fall within the contours of the Education One© Education One Continuing Education Loan Program as defined by the Guaranty. Absent a loan adhering to the contractual parameters of a particular lending program, it does not fit within that program simply because it is made by a bank with a lending program. Consequently, there is a genuine dispute of material fact as to whether Medina's Loan was made under the Program (or any program).

### 3. The Trust cannot establish ownership of Medina's Loan or prove that it is subject to the Guaranty.

The Trust submitted a series of documents to demonstrate its ownership of Medina's Loan and, consequently, that the Loan is subject to the Trust Agreement adopting the Guaranty between Bank One and TERI. However, the documents submitted by the Trust are insufficient to establish ownership of the Loan.

For the Trust to prove ownership of Medina's Loan, every document evidencing an assignment of ownership must reference the specific accounts pertaining to the Loan at issue. It is insufficient to make reference only generally to thousands of accounts being purchased at the same time without referencing Medina's account. *See, e.g.*, *In re Kendall*, 380 B.R. 37, 46 (Bankr. N.D. Okla. 2007) ("The Bill of Sale is insufficient to establish that the [debt] was transferred to [the creditor]. The Bill of Sale does not identify the [debt] as one of the 2,875 accounts transferred[.]"). But the documents provided by the Trust do not even reference Medina's Loan Program, generally.

The Trust's alleged "chain of title" leading to its ownership of Medina's Loan relies on a transfer of the Loan from JPMorgan to National Collegiate, and from National Collegiate to the Trust. But the documents submitted by the Trust are

- 36 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

1    insufficient to prove that a transfer between JPMorgan and National Collegiate
2    actually took place. As discussed, *supra*, the September 28, 2006 Pool between FMC
3    and JPMorgan (which purportedly transferred certain loans from JPMorgan to
4    National Collegiate) fails to: (1) reference Medina's Loan or Loan Program, (2)
5    mention any loans or loan programs included in the transfer (except for mentioning
6    a "Chase Extra$^{SM}$ Conforming Loan"), (3) include the referenced schedules so as to
7    reveal which loans or loan programs were included in the transfer, and (4) indicate
8    which loans or loan programs were included in the earlier September 30, 2003 NPA
9    that was not provided. Bk. Dkt. No. 64-8.

10   Hence, there is no evidence that Medina's Loan is actually owned by the
11   Trust. Further, in the absence of a NPA or a Pool that references specific loans or
12   loan programs, there is absolutely no evidence on record that *any* loans made under
13   Medina's Loan Program were actually transferred from JPMorgan to National
14   Collegiate (so as to be capable of transfer to the Trust). The subsequent transaction
15   documents between National Collegiate, the Trust, FMC, and TERI are irrelevant
16   given this "hole" in the chain of title between JPMorgan and National Collegiate.
17   Still, even if those documents could be considered, they similarly lack specific
18   references.

19   Notably, courts all over the country have declined to recognize other National
20   Collegiate trusts' ownership of education debt like Medina's based on finding
21   similar evidence insufficient. *See, e.g.*, *Nat'l Collegiate Student Loan Tr. 2007-4 v.*
22   *Watson*, 61 N.Y.S.3d 191 (N.Y. Civ. Ct. 2016) (holding that the 2007-4 Trust failed
23   to establish the chain of title from Charter One to the 2007-4 Trust and that the
24   September 20, 2007 DASA was insufficient to establish that National Collegiate
25   assigned the borrower's loan); *NTL Collegiate Stndt Loan Tr. 2005-1 v. Owusu*, 12th
26   Dist. Butler No. CA2015-07-137, 2016-Ohio-259, 2016 WL 363550, at ¶ 10
27   ("NCSLT did not include specific documentation to directly link the pool of debts

28

- 37 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

assigned to NCSLT from Charter One [in the pool agreement] to the debt [at issue]."); *Nat'l Collegiate Student Loan Tr. 2003-1 v. Thomas*, No. 48,627 (La. App. 2 Cir. 11/20/13); 129 So. 3d 1231, 1234 ("The Pooling Agreement offers no description of the loans being assigned by Bank One.").[49] Hence, there is a genuine dispute of material fact as to whether Medina's Loan was properly transferred to the Trust to be bound by the Trust Agreement providing for the guaranty by TERI.

### C. There is insufficient evidence that TERI is or was a *bona fide* nonprofit.

The Trust has not established that TERI is or was a "nonprofit." Alternatively, at minimum, there exists a genuine dispute of material fact as to TERI's nonprofit status. First, to date, the Trust has been unable to offer any evidence that TERI was a 501(c) organization, an evidentiary issue that troubled the Bankruptcy Court below. *See* Bk. Dkt. No. 74 at 15 ("Defendant maintains that TERI did obtain tax-exempt status from the IRS, but provides no evidence. Defendant explains that Defendant subpoenaed the IRS … but has yet to receive a response. The Court is troubled that Defendant did not even seek this evidence until after it filed its original motion for summary judgment."). If TERI was or is a 501(c) organization, why has it been unable to demonstrate as much? Second, even if TERI was at one point a 501(c) corporation, that would not be dispositive of the issue. Tax exempt status does not on its own establish nonprofit status for the purposes of Section 523(a)(8)(A)(i). *In re Rosen*, 179 B.R. 935, 940 (Bankr. D. Or. 1995). And Congress did not use the term "501(c)" in Section 523(a)(8)(A)(i), though it has done so in a number of statutes, including in the Bankruptcy Code. *See, e.g.*, 11 U.S.C. § 101(12A)(B).

---

[49] *See also Nat'l Collegiate Loan Trust 2007-3 c/o FMD Legal v. Lafavers, et al.*, No. 12-CI-629 (Pulaski Cir. Ct. of Ky. Oct. 1, 2013), *available at* https://www.nclc.org/images/pdf/unreported/Lafavers_Order.pdf.

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

Where a statute employs the word "nonprofit" without defining it as a 501(c), courts conduct an independent inquiry into the entity's character to determine whether it "actually operates as a nonprofit, irrespective of its tax-exempt status." *Zimmerman v. Cambridge Credit Counseling Corp.*, 409 F.3d 473, 478 (1st Cir. 2005).[50] Federal courts cannot abrogate this duty and simply accept a state's classification because issues of dischargeability are governed by federal law. *Grogan v. Garner*, 498 U.S. 279, 283-84 (1991) ("The validity of a creditor's claim is determined by rules of state law. … Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code.") (citations omitted).[51]

"[N]o clear test for determining when a nonprofit institution is—or is not—a nonprofit institution under section 523(a)(8) of the Bankruptcy Code has been formulated." *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 927 (1st Cir. 1995) (citing cases). However, in other contexts, "nonprofit status depend[s] primarily on proof that the entity did not distribute profits to stockholders or others[,]" including "those who control it." *Zimmerman*, 409 F.3d at 478. Disbursing profits to "other, for-profit companies" through "suspect transactions" may result in a finding that an

---

[50] *See also id.* at 476 ("We may assume that, when drafting the CROA, Congress was aware of this archetypal language for equating nonprofit status with federal tax-exempt status. … Yet Congress chose a different formulation …. This is strong evidence that Congress did not intend to conflate nonprofit status with section 501(c)(3) tax-exempt status."). The court in *Zimmerman* also looked to the legislative history to determine Congress's intent. *Id.* at 476 n.6. Here, legislative history demonstrates that Congress intended to refer to a "nonprofit institution of higher education."

[51] Although the meaning of "nonprofit institution" is seldom litigated, "governmental unit" has been litigated for decades, and a state's classification is only one consideration. *In re Marcano*, 288 B.R. 324, 333 (Bankr. S.D.N.Y. 2003) (collecting cases); *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921 (1st Cir. 1995) (concluding credit unions were "governmental units" under Section 523(a)(8)).

- 39 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

organization "did not operate as a nonprofit." *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 278 (D. Mass. 2008), *aff'd sub nom. Zimmerman v. Puccio*, 613 F.3d 60 (1st Cir. 2010); *see also Est of Hawaii v. Comm'r of Internal Revenue*, 71 T.C. 1067, 1082 (1979), *aff'd,* 647 F.2d 170 (9th Cir. 1981) (revoking 501(c) status where nonprofit "was simply the instrument to subsidize [] for-profit corporations"). Similarly, when an organization's activities are "designed to enhance the profitability of" a for-profit corporation or "benefited private interests," it is not a nonprofit. *P.L.L. Scholarship Fund v. Comm'r of Internal Revenue*, 82 T.C. 196, 200 (1984).

There is evidence that TERI engaged in a number of "suspect transactions" with FMC, and the entities were at times indistinguishable. *In re O'Brien*, 318 B.R. 258, 259 (S.D.N.Y. 2004), *aff'd,* 419 F.3d 104 (2d Cir. 2005) (referencing "First Marblehead Education Resources, Inc. f/k/a The Education Resources Institute a/k/a TERI"). FMC acquired TERI in 2001,[52] and under their "strategic relationship," FMC "acquired TERI's historical database and loan processing operations," and "161 members of TERI's staff became [its] employees." *See* Form 10-K for Fiscal Year 2004 filed by FMC at 12, *available at* https://sec.report/Document/0001047469-04-028806/. FMC also assumed control over TERI's loan origination duties and default management services. *Id.* at 12-13.

"During fiscal [year] 2002, 2003 and 2004, processing fees from TERI represented approximately 34%, 23% and 18%, respectively, of [FMC's] total service revenue." *Id.* at 13; *see also In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 148-49 (D. Mass. 2009) (An important component of First Marblehead's profitability was [its] relationship with The Education Resources

---

[52] *First Marblehead Corp. v. House*, 541 F.3d 36, 40 (1st Cir. 2008) (The CEO and Executive Vice President of FMC "both testified that the company … was in a precarious financial situation until the successful acquisition of TERI in 2001[.]")

- 40 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

Institute, Inc. ('TERI').''). Thus, TERI was a key component for generating profits for FMC. *See also* Bk. Dkt. No. 66-2 at 49-50. This evidence, as well as evidence presented below, establish a genuine disputer of material fact as to whether TERI was or is a nonprofit.

### CONCLUSION

For the foregoing reasons, Plaintiff-Appellant respectfully requests this Court reverse the Bankruptcy Court's grant of summary judgment, and remand for further proceedings.

Dated: December 31, 2020                    Respectfully submitted,


/s/__Christopher R. Bush_____
Christopher Bush, CA Bar No. 243471
LAW OFFICE OF CHRIS BUSH
2727 Camino del Rio S., Ste. 135
San Diego, California 92108
(619) 678-1134
chris@chrisbushlaw.com

Austin C. Smith, NY Bar No. 5377254
Kathryn J. Johnson, LA Bar No. 36513
SMITH LAW GROUP LLP
99 Wall Street, No. 426
New York, New York 10005
(917) 267-2068
austin@acsmithlawgroup.com
kaki@acsmithlawgroup.com

*Counsel for Plaintiff-Appellant*

- 41 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT                    20-CV-1912-BEN-MDD

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I certify that this brief is proportionally spaced, has a typeface of 14 points, and contains 1,173 lines, as required by Fed. R. App. P. 32(a)(7)(B).

Dated: December 31, 2020              /s/__Christopher R. Bush_____

                                                      Christopher Bush

                                                      *Counsel for Plaintiff-Appellant*

- 42 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT

20-CV-1912-BEN-MDD

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 31, 2020, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Southern District of California by using the PACER (CM/ECF) system.

I further certify that parties of record to this appeal who either are registered PACER (CM/ECF) users, or who have registered for electronic notice, or who have consented in writing to electronic service, will be served through the PACER (CM/ECF) system.

Holly Nolan on behalf of Defendant National Collegiate Student Loan Trust 2006-3: holly@sglwlaw.com

Scott Weltman on behalf of Defendant National Collegiate Student Loan Trust 2006-3: sweltman@weltman.com, colcaecf@weltman.com

Dated: December 31, 2020          /s/__Christopher R. Bush_____
                                  Christopher Bush

                                  *Counsel for Plaintiff-Appellant*

- 43 -

**OPENING BRIEF OF PLAINTIFF-APPELLANT**
Appeal from the United States Bankruptcy Court for the Southern
District of California, Adversary No. 19-AP-90065-LT          20-CV-1912-BEN-MDD